# United States Court of Appeals for the Federal Circuit

---

**SYNGENTA CROP PROTECTION, LLC,**
*Plaintiff-Appellant*

**v.**

**WILLOWOOD, LLC, WILLOWOOD USA, LLC, WILLOWOOD AZOXYSTROBIN, LLC, WILLOWOOD LIMITED,**
*Defendants-Cross-Appellants*

---

2018-1614, 2018-2044

---

Appeals from the United States District Court for the Middle District of North Carolina in No. 1:15-cv-00274-CCE-JEP, Judge Catherine C. Eagles.

---

Decided: December 18, 2019

---

RUSSELL EVAN LEVINE, Kirkland & Ellis LLP, Chicago, IL, argued for plaintiff-appellant. Also represented by HARI SANTHANAM, MEREDITH ZINANNI.

STEVEN EDWARD TILLER, Whiteford, Taylor & Preston LLP, Baltimore, MD, argued for defendants-cross-appellants. Also represented by PETER JAMES DAVIS; BARRY S. NEUMAN, Washington, DC; ALAN DUNCAN, LESLIE COOPER HARRELL, Mullins Duncan Harrell & Russell PLLC, Greensboro, NC.

MEGAN BARBERO, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC, argued for amicus curiae United States. Also represented by MARK R. FREEMAN, JOSEPH H. HUNT; MATTHEW G.T. MARTIN, The United States Attorney's Office, Middle District of North Carolina, United States Department of Justice, Greensboro, NC.

MELVIN C. GARNER, Leason Ellis LLP, White Plains, NY, for amicus curiae New York Intellectual Property Law Association. Also represented by LAUREN BETH EMERSON, ROBERT M. ISACKSON, MARTIN SCHWIMMER.

JAMES PETER RATHVON, Paley Rothman, Bethesda, MD, for amici curiae Aceto Agricultural Chemicals Corp., Aceto Corporation, AgLogic Chemical, LLC, Agro-Gor Corp., Albaugh, LLC, Argite, LLC, Atticus, LLC, Axss Technical Holdings, LLC, Chemstarr, LLC, Consus Chemicals, Inc., Decco US Post-Harvest, Inc., Drexel Chemical Company, Ensystex, Inc., Ensystex II, Inc., Ensystex III, Inc., Ensystex IV, Inc., Extremis, LLC, GeneraTec, LLC, Gharda Chemicals International, Inc., Helm Agro US, Inc., LG Chem, Ltd., MEY Corporation, PBI Gordon Corp., Promika, LLC, Raymat Crop Science, Inc., Raymat Materials, Inc., RedEagle International, LLC, RiceCo, LLC, Rotam Agrochemical Company, Ltd., Rotam Ltd., Rotam North America Inc., Sharda CropChem Ltd., Sharda USA, LLC, Summit Agro US, LLC, Summit Agro North America Holding Corporation, Tacoma AG, LLC, Tide International USA, Inc., Troy Corporation, United Phosphorus, Inc., UPL Delaware Inc., Woodstream Corporation.

JEFFREY PAUL KUSHAN, Sidley Austin LLP, for amici curiae Biotechnology Innovation Organization, CropLife International. Also represented by KATHI A. COVER, iBiquity Digital Corporation, Columbia, MD.

_____

Before REYNA, TARANTO, and STOLL, *Circuit Judges.*

REYNA, *Circuit Judge.*

Syngenta Crop Protection, LLC, sued Willowood, LLC, Willowood USA, LLC, Willowood Azoxystrobin, LLC, and Willowood Limited in the U.S. District Court for the Middle District of North Carolina for copyright infringement and patent infringement, asserting four patents directed to a fungicide compound and its manufacturing processes. Prior to trial, the district court dismissed the copyright infringement claims, determining them to be precluded by the Federal Insecticide Fungicide and Rodenticide Act. The district court granted-in-part and denied-in-part Syngenta Crop Protection, LLC's summary judgment motion with respect to patent infringement. The district court also denied-in-part the defendants' motion to exclude expert testimony on damages.

After a jury trial, the district court entered judgment in favor of Willowood Limited on all patent infringement claims; in favor of all defendants on infringement of one patent at issue; and against Willowood, LLC, and Willowood USA, LLC, on infringement of the remaining three patents. The district court denied Syngenta Crop Protection, LLC's motions for judgment as a matter of law. Syngenta Crop Protection, LLC, appeals the district court's denials of its motions for judgment as a matter of law and its final judgment. Defendants conditionally cross-appeal the district court's partial denial of their motion to exclude expert testimony on damages. For the reasons explained below, we affirm-in-part, reverse-in-part, vacate-in-part, and remand for further proceedings consistent with this opinion.

BACKGROUND

I. The Asserted Patents

Syngenta Crop Protection, LLC, ("Syngenta") is the assignee of U.S. Patent Nos. 5,602,076 ("the '076 patent"),

5,633,256 ("the '256 patent"), 5,847,138 ("the '138 patent"), and 8,124,761 ("the '761 patent"). The '076 patent is entitled "Certain Fungicides, Pesticides and Plant Growth Regulants." The '256 patent is entitled "Certain Pyrimidinyloxy-phenyl Acrylates, Derivatives Thereof and Their Fungicidal Use." The '076 and '256 patents (collectively, "the Compound Patents") expired on February 11, 2014. The Compound Patents are directed to a group of chemical compounds, including azoxystrobin, a fungicide commonly used in agriculture to control fungal growth on crops. J.A. 7; Appellant's Br. 9.

The '138 patent is entitled "Chemical Process" and expired on December 8, 2015. The '138 patent is directed to a two-step process for manufacturing azoxystrobin that includes an etherification step followed by a condensation step. Appellant's Br. 12; J.A. 6672. The etherification step produces an intermediate compound that is then used in the condensation step to produce azoxystrobin. J.A. 6672.

The '761 patent is entitled "Processes for the Preparation of Azoxystrobin Using DABCO as a Catalyst and Novel Intermediates Used in the Processes" and does not expire until April 15, 2029. The '761 patent is directed to a process of using the chemical catalyst 1,4-diazabicyclo[2.2.2]octane ("DABCO") during the condensation step to manufacture azoxystrobin. '761 patent col. 1 ll. 20–25; J.A. 6682–83. Each claim of the '761 patent requires at least "the presence of between 0.1 and 2 mol % of [DABCO]." '761 patent col. 20 ll. 1–2, 25–26.

## II. The Asserted Copyrights

Syngenta uses azoxystrobin as an active ingredient in formulating its fungicide end-use products. Appellant's Br. 7. Syngenta markets and sells these end-use products under several brand names, including QUADRIS® and QUILT XCEL®. *Id.* Both products are sold with detailed labels that provide directions for use, storage, and disposal, as well as first-aid instructions and environmental,

physical, and chemical hazard warnings. *Id.* at 19. The QUADRIS® label comprises fifty-four pages of small-type text and charts. J.A. 276; 424–77. The QUILT XCEL® label comprises twenty-nine pages of small-type text and charts. J.A. 276; 481–509. Syngenta registered these two labels with the U.S. Copyright Office on March 25, 2015. Appellant's Br. 19; J.A. 276–77, 479.

### III. District Court Proceedings

On March 27, 2015, Syngenta brought suit against Willowood, LLC ("Willowood LLC"), Willowood USA, LLC ("Willowood USA"), and Willowood Limited ("Willowood China") (collectively, "Willowood")[1] for patent and copyright infringement. Willowood China is a Hong Kong company that contracts for the manufacture of azoxystrobin in China and sells the fungicide to Willowood USA, its Oregon-based affiliate. Willowood USA and Willowood LLC contract with third parties to formulate azoxystrobin into Willowood's generic end-use fungicide products, and market and sell azoxystrobin and those end-use products in the United States. Shortly before the expiration of the Compound Patents, Willowood filed applications with the Environmental Protection Agency ("EPA") to register its Azoxy 2SC and AzoxyProp Xtra generic products, which correspond in composition and labeling to Syngenta's QUADRIS® and QUILT XCEL® fungicides, respectively. J.A. 278, 714; Appellant's Br. 19.

Syngenta asserted in its suit that Willowood's Azoxy 2SC and AzoxyProp Xtra products infringed claims 1–4 and 12–14 of the '076 patent, claims 1–3, 5, and 7 of the '256 patent, claims 6 and 12–14 of the '138 patent, and claims 1, 3–5, and 9–10 of the '761 patent. J.A. 1617–

---

[1]    Syngenta also sued Willowood Azoxystrobin, LLC, but does not appeal the district court's rulings concerning this entity. Appellant's Br. 6 n.1.

1619, 1627. Syngenta also asserted that Willowood infringed Syngenta's registered copyrights in its QUADRIS® and QUILT XCEL® labels by copying those labels for Willowood's Azoxy 2SC and AzoxyProp Xtra product labels. J.A. 289–91.

## A. Pre-Trial Motions

On October 31, 2016, both parties filed motions for summary judgment. Syngenta moved for summary judgment that all asserted claims of the four patents were infringed by Willowood. Willowood cross-moved for summary judgment, seeking dismissal of Syngenta's copyright claims and its claim of infringement of the '761 patent.

### 1. Patent Infringement Claims

The district court granted summary judgment against Willowood USA for direct infringement of the Compound Patents on the basis of Willowood's concession that Willowood USA imported five kilograms of azoxystrobin into the United States in 2013, prior to the Compound Patents' expiration. *Syngenta Crop Prot., LLC v. Willowood, LLC*, No. 1:15-CV-274, 2017 WL 1133378, at *2 (M.D.N.C. Mar. 24, 2017) ("*Summary Judgment Order*"); *see also* J.A. 1617–18. The district court also granted summary judgment against Willowood LLC for induced infringement of the Compound Patents on the basis of Willowood's concession that Willowood LLC contributed to and induced the formulation and testing of Willowood's Azoxy 2SC and AzoxyProp Xtra products by third parties using the same imported five kilograms of azoxystrobin. *Summary Judgment Order*, 2017 WL 1133378, at *2–3; *see also* J.A. 1618. The district court, however, denied summary judgment against Willowood China for direct infringement of the Compound Patents. *Summary Judgment Order*, 2017 WL 1133378, at *2. The district court found a genuine dispute of material fact as to whether Willowood China's sale of five kilograms of azoxystrobin to Willowood USA took place in

China or within the United States as required under 35 U.S.C. § 271(a). *Id.*

The district court next denied summary judgment as to infringement of the '138 patent. *Id.* at *5. The district court found that it was undisputed that Willowood China purchases azoxystrobin from its Chinese supplier, Yang-cheng Tai He Chemicals Corp. ("Tai He"), and sells it to Willowood USA, which then imports the azoxystrobin into the United States. *Id.* at *4; *see also* J.A. 1619. The district court found that it was also undisputed that the azoxystrobin in question was manufactured in China by performing both steps of the process claimed in the '138 patent. *Summary Judgment Order*, 2017 WL 1133378, at *4. Relying on our decision in *Akamai Technologies., Inc. v. Limelight Networks, Inc.*, the district court determined that 35 U.S.C. § 271(g) requires that all steps of a claimed process be performed by or attributable to a single entity. *Id.* at *5 (citing 797 F.3d 1020, 1022 (Fed. Cir. 2015)). On this basis, the district court found a genuine dispute of material fact as to whether Tai He performed both steps of the process claimed by the '138 patent during its manufacture of azoxystrobin or whether Willowood directed Tai He and others to practice the claimed process. *Id.* at *4–5.

With respect to the '761 patent, both parties agreed that the issue of infringement turned on whether the azoxystrobin that Willowood China purchases and Willowood USA imports was manufactured using DABCO at concentrations within the claimed range of 0.1 and 2 mol %. *Summary Judgment Order*, 2017 WL 1133378, at *6; J.A. 1627. The district court denied summary judgment on this issue, finding a genuine dispute of material fact as to whether Willowood's suppliers used DABCO within the claimed range in the manufacturing process. *See Summary Judgment Order*, 2017 WL 1133378, at *7.

The district court next granted Syngenta's motion to shift the burden of proof to Willowood under 35 U.S.C.

§ 295 on the claim of infringement of the '761 patent. The district court found that Syngenta demonstrated a substantial likelihood of infringement, rejecting Willowood's argument that neither Tai He nor any of its intermediaries manufacture azoxystrobin using DABCO within the claimed range. *Id.* at \*7–8. The district court credited the testimony of Syngenta's expert, who testified that it would not be commercially reasonable to manufacture azoxystrobin using DABCO outside the claimed range. *Id.* at \*8. The district court noted that Willowood's expert did not rebut this testimony, and Willowood's only rebuttal witness, the president of Tai He, had "credibility issues." *Id.* The district court also determined that Willowood did not produce any manufacturing records demonstrating that DABCO was not used or describing what process was used instead. *Id.* at \*8, \*10. The district court further found that Syngenta made reasonable efforts to discover Tai He's actual manufacturing process, but was unsuccessful because of Willowood's failure to cooperate. *Id.* at \*9–10. Finding both elements of § 295 satisfied, the district court shifted the burden to Willowood to prove non-infringement of the '761 patent. *Id.* at \*11.

## 2. Copyright Infringement Claims

In its cross-motion for summary judgment, Willowood argued that Syngenta's copyright claims should be dismissed because the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") precludes copyright protection for Syngenta's labels. J.A. 730–37. Willowood asserted that FIFRA requires generic fungicide products to have labels that are "identical or substantially similar" to brand-name labels. J.A. 730–31. Willowood further contended that because much of its labels' text comprises instructions and warnings mandated by FIFRA and EPA regulations, and only limited means of expressing such information exist, extending copyright protection to Syngenta's labels "would make subsequent labeling practically impossible." J.A. 731 & n.14, 733–35 (citing *SmithKline Beecham Consumer*

*Healthcare, L.P. v. Watson Pharm. Inc.*, 211 F.3d 21, 23 (2d Cir. 2000)).

Willowood also argued that any language that is not required by the EPA is nonetheless uncopyrightable because it is so "basic" and "commonplace in the industry," that it merges with the ideas the language is meant to convey. J.A. 732. In the alternative, Willowood argued that its use of some of the language from Syngenta labels constituted permissible fair use. J.A. 737–40.

In response, Syngenta argued that nothing in FIFRA or EPA regulations authorizes or requires Willowood to copy verbatim Syngenta's labels. J.A. 2806. Syngenta asserted that pursuant to FIFRA's legislative scheme, the EPA requires only generic products—not label language—to be identical or substantially similar to their brand-name counterparts, and then only to the extent that a generic applicant seeks expedited review by the EPA. *Id.* In support of its arguments, Syngenta relied heavily on *FMC Corp. v. Control Solutions., Inc.*, a decision from the Eastern District of Pennsylvania, which held that FIFRA does not preclude copyright protection for pesticide labels because "verbatim or nearly wholesale copying of another registrant's label is unnecessary to obtain expedited review by the EPA of a label." 369 F. Supp. 2d 539, 553–60 (E.D. Pa. 2005); *see* J.A. 2806.

The United States filed a statement of interest on this issue, presenting four arguments in support of Willowood's position. J.A. 2969–3005. First, according to the government, FIFRA "endorses" copying by generic applicants and furthers Congress's intent of expediting market access for generic fungicide manufacturers. J.A. 2970, 2983–91. Second, the government asserted that Syngenta granted Willowood an implied license to copy its labels by participating in FIFRA's labeling scheme. J.A. 2970, 2991–94. Third, the government argued that Willowood's labels are protected under the doctrine of merger, which permits copying

of material that can only be expressed in a limited number of ways. J.A. 2971, 2994–98. Lastly, the government argued that Willowood's labels are also protected under the doctrine of fair use. J.A. 2971, 2998–3005.

The district court agreed with Willowood and the United States, and issued a short order granting summary judgment against Syngenta and dismissing its copyright infringement claims. J.A. 33–34. The district court stated that it found the analysis in *FMC* "unconvincing," and determined that "[e]ven with some changes, use of the original pesticide label as a 'go by' for the new label will result in copyright infringement." *Id.* The district court concluded that because FIFRA contemplates copying by a generic applicant "in ways that would otherwise infringe a copyright, . . . Congress intended a narrow exception to copyright protection for the required elements" of fungicide labels. *Id.* The district court did not otherwise address the arguments presented on this issue.

### 3. Willowood's Motion to Exclude

On April 10, 2017, Willowood filed a motion to exclude the testimony of Syngenta's damages expert. J.A. 3838–67; *see also* J.A. 37. Willowood did not object to the expert's methodology; rather, Willowood contended that the expert's choice of benchmarks was based on unreliable facts or data. J.A. 44. Willowood argued that the expert's damages calculation was speculative and unreliable because he based his analysis on products unrelated to azoxystrobin and Syngenta's "wildly inaccurate" budgets. J.A. 48; *see also* J.A. 3851–3861. Willowood also argued that Syngenta's expert did not properly apportion damages for infringement of the '761 patent because the expert relied on the same methodology that he used to calculate damages for infringement of the '138 patent, even though the '138 patent claims two steps of the manufacturing process (etherification and condensation) while the '761 patent claims only one step (condensation). J.A. 3861–3865.

The district court denied Willowood's motion to exclude with respect to the Compound Patents, determining that Syngenta's expert relied on "sufficient facts and data applied using a reasonable method in a justifiable manner" based on a hypothetical non-infringing market with a similar product as a benchmark. J.A. 35. The district court approved the expert's choice of using an herbicide product as a benchmark, explaining that both products created similar barriers to generic access to the markets, were sold in similar markets, protected the same crops, had comparable life cycles, and were both leading products for Syngenta. J.A. 47, 50. With respect to using Syngenta's budgets as benchmarks, the district court found that the expert accounted for any errors in budgeting, and explained that any inaccuracies went to the weight of the evidence instead of its admissibility. J.A. 49.

The district court, however, granted Willowood's motion to exclude Syngenta's expert's testimony with respect to the '138 and '761 patents, finding that the expert did not provide an adequate explanation for his choice of benchmarks. The district court found that in contrast to the benchmarks chosen for the Compound Patents, the expert provided "scant analysis for why non-azoxystrobin fungicides" were a proper benchmark and no evidence of similarities between the products and their markets. J.A. 53–54. The district court also excluded testimony on lost profits with respect to the '761 patent, explaining that the expert failed to address but-for causation or account for existing non-infringing alternatives in his calculations. J.A. 55–58.

## B. Trial and Post-Trial Motions

The district court held a seven-day trial beginning on September 5, 2017. With respect to the Compound Patents, the only issues at trial were whether Willowood China imported into the United States or sold to Willowood USA within the United States the five-kilogram sample of

azoxystrobin. Syngenta argued that Willowood China imported azoxystrobin into the United States by arranging for its entry into the country. J.A. 6961. Syngenta also argued that Willowood China's sale of the azoxystrobin necessarily occurred within the United States because Willowood USA is located within the United States. *Id.* Willowood argued in response that Willowood China did not infringe the Compound Patents because the shipment of five-kilogram sample of azoxystrobin was marked "f.o.b. China,"[2] meaning that title to the azoxystrobin passed from Willowood China to Willowood USA overseas. J.A. 6961. After presenting its case, Syngenta moved for a judgment as a matter of law ("JMOL") on this issue.

The district court denied Syngenta's JMOL motion, and the jury returned a specific verdict in favor of Willowood China, finding that Syngenta did not prove that Willowood China imported azoxystrobin into the United States or sold azoxystrobin within the United States. J.A. 266. The jury awarded Syngenta $75,600 in damages for infringement of the Compound Patents by Willowood USA and Willowood LLC. Syngenta renewed its motion for JMOL after the verdict, which the district court again denied. J.A. 6523; Appellant's Br. 12.

With respect to the '138 patent, the only issue at trial was whether both steps of the claimed process were performed by a single entity or attributable to Willowood as the directing or controlling entity. J.A. 240–241; 266; Appellant's Br. 13. Syngenta presented evidence that Willowood directed or controlled Tai He's manufacturing process, and that Tai He performed both claimed steps.

---

[2] "F.o.b" stands for "free on board" and designates a method of shipment whereby legal title passes from the seller to the buyer once goods are delivered at a designated location. *Litecubes, LLC v. N. Light Prod., Inc.*, 523 F.3d 1353, 1358 n.1 (Fed. Cir. 2008).

Appellant's Br. 13–15.  In rebuttal, Willowood presented evidence that Tai He did not perform the etherification step when manufacturing Willowood's azoxystrobin.  *See* J.A. 8232–8241; J.A. 7682 at 63:22–64:11; Appellant's Br. 15.  The jury returned a specific verdict in favor of Willowood with respect to the '138 patent, finding that Syngenta did not prove that both steps of the claimed process were performed by or attributable to a single entity.  J.A. 266.

With respect to the '761 patent, the only issue at trial was whether during manufacture of Willowood's azoxystrobin, the condensation step was performed using the DABCO catalyst within the range claimed by the '761 patent.  J.A.  248–50; Appellant's Br. 17.  The burden of proof was on Willowood pursuant to the district court's order under 35 U.S.C. § 295.  *Summary Judgment Order*, 2017 WL 1133378, at *11.  After presenting its case, Syngenta moved for JMOL on this issue, which the district court denied.  J.A. 7045; Appellant's Br. 18.  After trial, the jury returned a specific verdict in favor of Syngenta that "the Defendants" did not prove that DABCO was not used as claimed.  J.A. 267.  The jury awarded $900,000 in damages to Syngenta for infringement of the '761 patent "by the Defendants."  *Id.*

After trial, the parties submitted proposed final judgments to the district court.  J.A. 6489.  At that point, a dispute arose between the parties as to whether the jury found that Willowood China infringed the '761 patent.  In resolving the dispute, the district court noted that the jury found with respect to the Compound Patents that Willowood China did not import azoxystrobin into the United States or sell azoxystrobin within the United States.  *Id.*  The district court explained that "[n]either party asked the court to submit a separate issue as to Willowood China's infringement of the '138 patent or the '761 patent," and concluded that "the parties implicitly agreed to resolve Willowood China's liability for the ['138 and '761 patents]

based on the answer to the importation question which was first on the verdict sheet." *Id.* The district court concluded that "[t]here is no evidentiary basis" for finding that Willowood China infringed the '761 patent. *Id.*

On November 20, 2017, the district court entered final judgment. The district court entered judgment in favor of Willowood China on "all claims" and in favor of all Willowood defendants on the claim of infringement of the '138 patent. J.A. 3. The district court entered judgment against Willowood USA and Willowood LLC on the claims of infringement of the Compound Patents and the '761 patent. *Id.* After the district court entered final judgment, Syngenta renewed its JMOL motion with respect to Willowood China's infringement. J.A. 6522–6523; Appellant's Br. 18. Syngenta contended that Willowood waived its argument that Willowood China did not infringe the '761 patent by not objecting to the wording of the jury verdict form. J.A. 6522. The district court denied Syngenta's renewed JMOL motion. J.A. 91.

Syngenta appeals the district court's dismissal of its copyright claims, the district court's conclusion that § 271(g) requires every step of a claimed process to be performed by or attributable to a single entity, the jury's verdict that Willowood did not infringe the '138 patent even with the single entity requirement imposed on § 271(g), and the district court's judgment that Willowood China did not infringe any of the asserted patents. Willowood conditionally cross-appeals the district court's partial denial of its motion to exclude the testimony of Syngenta's damages expert. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

DISCUSSION

I. Standard of Review

We review a district court's decisions on motions for summary judgment and JMOL under the law of the regional circuit, in this case the Fourth Circuit. *Supernus*

*Pharm., Inc. v. Iancu*, 913 F.3d 1351, 1356 (Fed. Cir. 2019); *Mohsenzadeh v. Lee*, 790 F.3d 1377, 1381 (Fed. Cir. 2015). The Fourth Circuit reviews the grant of a motion for summary judgment de novo, viewing all evidence in the light most favorable to the non-moving party. *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 761 F.3d 1329, 1337–38 (Fed. Cir. 2014) (citing *Ramos v. S. Maryland Elec. Co–op., Inc.*, 996 F.2d 52, 53 (4th Cir. 1993)). The Fourth Circuit reviews a district court's post-verdict JMOL decisions de novo, determining whether the jury's verdict is supported by substantial evidence. *LifeNet Health v. LifeCell Corp.*, 837 F.3d 1316, 1322 (Fed. Cir. 2016) (citing *Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am.*, 492 F.3d 484, 488 (4th Cir. 2007)). The Fourth Circuit reviews a district court's pre-verdict grant of JMOL de novo, viewing all evidence in light most favorable to the non-moving party and considering whether a reasonable jury could find for the non-moving party. *ActiveVideo*, 694 F.3d at 1319 (citing *Brown v. CSX Transp.*, 18 F.3d 245, 248 (4th Cir. 1994)).

We review questions of patent law under Federal Circuit law. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1214 (Fed. Cir. 2014). We review a jury's findings on questions of fact, such as infringement and damages, for substantial evidence. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1377 (Fed. Cir. 2013). We review a district court's decisions concerning damages methodologies for abuse of discretion. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1332 (Fed. Cir. 2012) (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1310 (Fed. Cir. 2009)).

We apply copyright law as interpreted by the regional circuit. *Amini Innovation Corp. v. Anthony Cal., Inc.*, 439 F.3d 1365, 1368 (Fed. Cir. 2006). Interpretation of the rights granted by the Copyright Act is a question of law that the Fourth Circuit reviews de novo. *See Rosciszewski v. Arete Assocs., Inc.*, 1 F.3d 225, 229 (4th Cir. 1993).

We also review a district court's rulings on admission of expert testimony under the law of the regional circuit. *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 516 (Fed. Cir. 2012). The Fourth Circuit reviews such evidentiary rulings for abuse of discretion. *Id.* (citing *Kopf v. Skyrm*, 993 F.2d 374, 378 (4th Cir. 1993)).

We review questions of statutory interpretation de novo. *Mohsenzadeh*, 790 F.3d at 1381 (citing *AD Global Fund, LLC v. United States*, 481 F.3d 1351, 1353 (Fed. Cir. 2007)). If two statutory provisions are "capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018 (1984) (quoting *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 133-34 (1974)) (internal quotation marks omitted).

## II. Syngenta's Copyright Claims

Syngenta challenges the district court's summary judgment order dismissing its copyright claims in their entirety. The dismissal was based on the court's holding that FIFRA "precludes copyright protection for the required elements of pesticide labels as against the labels of me-too [*i.e.* generic[3]] registrants." J.A. 33. We conclude that this determination was premature. Because the text of FIFRA does not, on its face, require a me-too registrant to copy the label of a registered product, the statute only conflicts with the Copyright Act to the extent that some particular element of Syngenta's label is both protected under existing

---

[3]     Consistent with terminology used by the EPA, the parties and the district court use the term "me-too" to refer to applications requesting registration of generic pesticide products pursuant to FIFRA's criteria for expedited review. *See* EPA, PRIA Glossary, https://www.epa.gov/pria-fees/pria-glossary (last visited December 9, 2019).

copyright doctrines and necessary for the expedited approval of Willowood's generic pesticide product. This determination requires this court to review the merits of Syngenta's copyright claims, which the district court did not reach. Thus, we remand for the court to do so in the first instance.

When evaluating the "alleged preclusion of a cause of action under one federal statute by the provisions of another federal statute," we rely on traditional rules of statutory interpretation. *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 111 (2014). Among these principles is the presumption that a later-enacted statute does not impliedly repeal, even in part, an earlier one. *Id.* (citing *Carcieri v. Salazar*, 555 U.S. 379, 395 (2009)). Thus, where the later-enacted statute does not cover the whole subject of the earlier one and is not "clearly intended as a substitute," an implied repeal will only be found where provisions in the two statutes are in "irreconcilable conflict"—a stringent standard that renders implicit repeals a "rarity." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662-63 (2007); *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 142 (2001). In the absence of such conflict, statutory provisions acting upon the same subject should be interpreted and applied in a way that "gives effect to each" and "preserves the purposes of both." *United States v. Borden Co.*, 308 U.S. 188, 198 (1939); *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1347 (Fed. Cir. 1999).

Here, the Copyright Act prohibits parties from reproducing the protected elements of a valid copyright without authorization, except where such actions would constitute fair use. *See Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 547 (1985); *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 801 (4th Cir. 2001); *Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 143 (4th Cir. 2000). At the same time, FIFRA provides for expedited EPA review of applications for generic

pesticide products when the proposed "me-too" product, as compared to the currently registered product, (1) "would be *identical* or *substantially similar* in composition and *labeling*" or (2) would "differ in composition and labeling" "only in ways that would *not significantly increase the risk of unreasonable adverse effects on the environment.*"  7 U.S.C. § 136a(c)(3)(B)(i)(I) (emphasis added).

In finding that FIFRA precluded copyright claims against me-too applicants, the district court relied on its understanding that "FIFRA contemplates that a 'me-too' applicant will copy from the original pesticide label in ways that would otherwise infringe a copyright." J.A. 33.  But while use of FIFRA's expedited generic pathway is premised on similarity to a registered product, the text of § 136 does not require a me-too applicant to ensure that its product label is identical to a registered label; nor does it require applicants to otherwise derive the elements of its label from that of the registered label.  Rather, the statute provides for expedited review so long as any differences between the proposed and registered products "would not significantly increase the risk of unreasonable adverse effects on the environment"—a substantive criterion evaluated by the EPA under its technical expertise.   7 U.S.C. § 136a(c)(3)(B)(i)(I).

This is significant because copyright infringement requires, at a minimum, some *copying* of *protected elements* from the copyrighted work, which does not include "any idea, procedure, process, system, method of operation, concept, principle, or discovery" embodied by the work.  17 U.S.C. § 102(b); *Lyons P'ship,* 243 F.3d at 801.  FIFRA's similarity requirement does not foreclose expedited review for an *independently composed* label that relies solely on *unprotected* facts, concepts, and methods derived from the registered label.

In this respect, the asserted conflict between the Copyright Act and FIFRA differs from the conflict between the

Copyright Act and the Hatch-Waxman Act that was addressed in *SmithKline*, a decision cited by the district court and Willowood. *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*, 211 F.3d 21 (2d Cir. 2000). There, the Second Circuit found that the Hatch-Waxman Act "not only permit[s] but *require[s]* producers of generic drugs *to use the same labeling* as was approved for, and is used in, the sale of the pioneer drug."[4] *Id.* at 25 (emphasis added). In these circumstances, the court concluded that generic applicants faced a double-bind: "if [the plaintiff's] copyright claim has merit, then [the defendant] cannot realistically use the ANDA process to sell its [generic product] because it will either have to change the label and lose FDA approval or be enjoined from using a label that infringes [the plaintiff's] copyright." *Id.* at 27. Thus, the court found it "obvious" that Congress intended for the Hatch-Waxman Act to "trump the copyright laws." *Id.* at 29. Here, in contrast, FIFRA's express allowance for differences between the proposed and registered labels allows me-too applicants to avoid this conflict by using an independently created label.

Willowood and 41 Companies Holding Generic EPA Pesticide Registrations ("Generics Amici") counter that there are nonetheless practical and regulatory constraints that frustrate their reasonable attempts to comply with the requirements of both the Copyright Act and expedited review under FIFRA. We disagree that these concerns alone warrant preclusion. To begin with, Generics Amici contend

---

[4]    The Hatch-Waxman Act requires that, except for changes related to the manufacturer name or approved difference in the drug, "[a]n abbreviated application for a new drug shall contain . . . (v) *information to show* that the *labeling* proposed for the new drug *is the same as* the labeling approved for the listed drug . . . ." 21 U.S.C. § 355(j)(2)(A) (emphases added).

there are "only so many ways to express the *same* instructions and warnings" contained in many portions of these pesticide labels, such that any attempt to capture the pertinent information will inevitably require using substantially the same expressions. Generics Amici Br. at 8 (emphasis in original); *see also* Appellee's Br. at 23-25. But this is precisely the type of problem addressed by the traditional copyright doctrine of merger, under which courts have declined to protect against copying when an underlying fact, procedure, or idea can be expressed in so few ways that "protection of the expression would effectively accord protection to the idea itself." *Kregos v. Associated Press*, 937 F.2d 700, 705 (2d Cir. 1991); *see also Morrissey v. Procter & Gamble Co.*, 379 F.2d 675, 678 (1st Cir. 1967) ("When the uncopyrightable subject matter is very narrow, so that the topic necessarily requires, if not only one form of expression, at best only a limited number, to permit copyrighting would mean that a party or parties, by copyrighting a mere handful of forms, could exhaust all possibilities of future use of the substance." (internal citations and quotation marks omitted)). Thus, copyright law has its own solution for the constraints inherent in the expression of certain information contained in pesticide labels.

Willowood raises a more difficult problem with respect to portions of a registered label for which the EPA has allegedly required me-too applicants to copy otherwise protectable elements from the registered label on the grounds that any differences may adversely affect the environment by confusing users.[5] For example, Willowood contends that when it sought to revise the directions for use in its own

---

[5] This is distinct from portions of the registered label where the language was originally mandated or suggested by the EPA. Syngenta has disclaimed any copyright protection over those label elements. Appellant's Reply Br. at 11.

label from the four-column table format used by Syngenta to a narrative form, the EPA required Willowood to reinstate the information in a table, essentially requiring Willowood to copy Syngenta's format. Appellee's Br. at 24 (citing J.A. 3129-3200 (Azoxy 2.08 SC Label); J.A. 3201-3339 (AzoxProp Xtra label)). But this is a predicament appropriately addressed, at least in the first instance, under copyright law's own "equitable rule of reason": the fair use doctrine. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 448 (1984) (quoting H. Rep. No. 94–1476, at 65–66, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5679). Under that established framework, the district court can assess, based on factors such as the character of the allegedly creative elements, their substantiality in the context of the labels as a whole, and the nature and effect of their use by Willowood, whether the presence of those elements in Willowood's generic labels would fairly constitute infringement in violation of the Copyright Act.[6]

Thus, we vacate the district court's grant of summary judgment on Syngenta's copyright claims and remand for further consideration. On remand, the district court should first discern whether the Copyright Act, as interpreted under existing copyright doctrines, would prohibit Willowood's use of any portion of Syngenta's label. The district court should, for instance, consider whether the fair-use doctrine or limits on copyrightable subject matter, such as the merger doctrine, would eliminate infringement.

---

[6]    The Copyright Act expressly identifies the following non-exhaustive factors to be considered in assessing fair use: "(1) the purpose and character of the use . . . ; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107.

Only if the district court concludes that the Copyright Act would in fact prohibit Willowood's conduct in a manner inconsistent with the purposes of FIFRA should it revisit the question of whether and to what extent FIFRA precludes Syngenta's copyright claims for any part of its pesticide labels. It is possible that after a full assessment of the requirements of copyright law and FIFRA as applied in this case, there may come to light a truly irreconcilable conflict between Copyright Act liability and implementation of FIFRA. In the absence of a clear facial conflict, however, we decline to wield the blunt tool of preclusion before the full factual and legal contours of any latent problem have been examined.

### III.  Infringement Under 35 U.S.C. § 271(g)

Syngenta next challenges the district court's interpretation of 35 U.S.C. § 271(g). The district court interpreted § 271(g) to require that all steps of a patented process be performed by or at the direction or control of a single entity before infringement liability under that section can attach. *Summary Judgment Order*, 2017 WL 1133378, at *5. Syngenta contends that the district court's interpretation of § 271(g) is contrary to the plain language of the statute and Congress's intent expressed in the legislative history. Appellant's Br. 41–46. The amici add to this argument by asserting that the district court's interpretation is inconsistent with the broader context of the statute as a whole and the purpose behind § 271(g), and creates an impossible evidentiary burden on the patent owner. *See* Amicus NYPLA Br. 10–14; Amici Biotechnology & CropLife Br. 8–14; 17–23. This is an issue of first impression. We conclude that the district court erred by imposing a single-entity requirement under § 271(g).

"As in all statutory construction cases, we begin with the language of the statute." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002). The meaning of statutory language "is determined by reference to the language itself,

the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). If the statutory language does not clearly resolve the disputed issue, we also consider the legislative history to determine Congressional intent. *Burlington N. R. Co. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 461 (1987); *In re Swanson*, 540 F.3d 1368, 1376 (Fed. Cir. 2008) (citing *Timex V.I. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998), and *Deluxe Corp. v. United States*, 885 F.2d 848, 850 (Fed. Cir. 1989)).

The resolution of this issue turns on the nature of the infringing acts covered by § 271(g). Section 271(g) provides in relevant part that "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer." 35 U.S.C. § 271(g) (2012). This language makes clear that the acts that give rise to liability under § 271(g) are the importation, offer for sale, sale, or use within this country of a product that was made by a process patented in the United States. *Id.* Nothing in this statutory language suggests that liability arises from *practicing* the patented process abroad. Rather, the focus is only on acts with respect to *products* resulting from the patented process. Thus, because the statutory language as a whole is clear that practicing a patented process abroad cannot create liability under § 271(g), whether that process is practiced by a single entity is immaterial to the infringement analysis under that section.

The context of the statute as a whole also supports our conclusion. Section 271(a) states that "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a). Derived from this statutory language is the single-entity requirement under § 271(a), which limits direct

infringement liability only to circumstances "where all steps of a claimed method are performed by or attributable to a single entity." *Akamai Techs.*, 797 F.3d at 1022; *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1379–81 (Fed. Cir. 2007).

On the basis of this court's § 271(a) jurisprudence, the district court concluded that § 271(g) similarly imposes a single-entity requirement on the performance of a patented process. *Summary Judgment Order*, 2017 WL 1133378, at *5 (citing *Akamai*, 797 F.3d at 1022). This conclusion was erroneous because infringement liability under the two sections is distinct. In contrast to § 271(g), the act that gives rise to liability under § 271(a) occurs when "a party . . . make[s], use[s], sell[s], or offer[s] to sell the patented invention, meaning the entire patented invention." *BMC*, 498 F.3d at 1380. Under this precedent, direct infringement under § 271(a) of a process patent occurs only when a single party practices every step of the claimed process. *Id.*; *see also* 35 U.S.C. § 271(a) (infringement occurs when "*whoever* without authority *makes, uses, offers to sell, or sells . . . or imports* . . . any patented invention" (emphasis added)). As discussed above, however, liability under § 271(g) is not predicated on practicing the claimed process, but rather on importing, offering for sale, selling, or using a product. *See* 35 U.S.C. § 271(g) (infringement occurs when "*whoever* without authority *imports . . . or offers to sell, sells, or uses . . . a product*" (emphasis added)). Thus, the single-entity requirement, which is necessary for direct infringement liability under § 271(a), has no application to acts that do not constitute infringement under § 271(g).

On the same basis we reject Willowood's argument that the Supreme Court's *Limelight* decision requires us to apply the single-entity rule to § 271(g). Willowood asserts that the Court in that case applied "the single entity rule to allegations of both direct and indirect infringement under [§] 271(a) and (b)." Appellee's Br. 29 (citing *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921–

22 (2014)). Willowood argues that because "§ 271(g) is simply another form of direct infringement," we are bound by the *Limelight* decision to apply the single-entity rule to § 271(g). *Id.* We disagree.

Willowood fundamentally misunderstands the nature of the act that gives rise to liability under § 271(g). Although § 271(g) may involve a form of direct liability, that liability does not arise from practicing a patented process abroad. *Limelight* is further inapposite because the statute at issue in *Limelight*—§ 271(b)—predicates induced infringement liability on the existence of direct infringement. 35 U.S.C. § 271(b) ("Whoever actively induces *infringement* of a patent shall be liable as an infringer." (emphasis added)); *Limelight*, 572 U.S. at 921. Because direct infringement under § 271(a) requires a single entity to perform all of the claimed steps, the Supreme Court explained that where "performance of all the patent's steps is not attributable to any one person[,] . . . . there has been no direct infringement," and consequently "no inducement of infringement under § 271(b)." *Id.* at 922. By contrast, infringement liability under § 271(g) is not predicated on direct infringement of the patented process, and we will "not read into the patent laws limitations and conditions which the legislature has not expressed." *Diamond v. Diehr*, 450 U.S. 175, 182 (1981) (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980)).

Section 271(f) reinforces our conclusion. Section 271(f) creates liability for induced infringement when a party "supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention . . . in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent *if such combination occurred within the United States.*" 35 U.S.C. § 271(f)(1) (2012) (emphasis added). If Congress intended to limit liability under § 271(g) to instances where the patented process was practiced in a manner that would

infringe the patent if such practice occurred within the United States—such as it did by requiring a single entity to perform the entire process under § 271(a)—it "kn[ew] precisely how to do so." *Limelight*, 572 U.S. at 923. Congress, however, did not do so, even though § 271(g) was enacted four years after § 271(f). *See Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 441 (2007); *Kinik Co. v. Int'l Trade Comm'n*, 362 F.3d 1359, 1362 (Fed. Cir. 2004). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Rodriguez v. United States*, 480 U.S. 522, 525 (1987) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)) (internal alterations and quotation marks omitted). The Supreme Court has warned that "courts should not create liability for . . . non-infringing conduct where Congress has elected not to extend that concept." *Limelight*, 572 U.S. 923. We heed this warning.

Willowood asserts that the inclusion of the phrase "if such combination occurred within the United States" in § 271(f) but not in § 271(g) demonstrates that Congress did not intend for § 271(g) to extend the scope of patent protection outside the United States to include conduct that would not constitute direct infringement domestically—such as the divided practice of a patented process by more than one entity. Appellee's Br. 41–42. We agree with this proposition but reject Willowood's conclusion that the absence of that phrase necessitates the application of the single-entity requirement to § 271(g). As explained above, practicing a patented process abroad does not give rise to infringement liability under § 271(g). Thus, our conclusion that a single entity need not perform every step of a patented process abroad under § 271(g) does not extend patent protection to cover extraterritorial conduct that would not otherwise trigger liability within the United States. Rather, it is Willowood who asks us to impermissibly apply

§ 271(g) to extraterritorial conduct by attempting to shift the focus of the statute from domestic acts of importation, offer for sale, sale, or use of a product to cover a foreign act of practicing a patented process. *See WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2137 (2018) ("If the conduct relevant to the statute's focus . . . . occurred in another country, 'then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.'" (quoting *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2094 (2016))). We are not inclined to do so.

Other sections of Title 35 add support to our conclusion that infringement under § 271(g) is not predicated on a single entity practicing a patented process abroad. For example, § 287(b), which limits available damages under § 271(g), states that "[t]he modifications of remedies provided in this subsection shall not be available to any [infringer under § 271(g)] who . . . had knowledge *before the infringement* that a patented process *was used* to make the product *the importation, use, offer for sale, or sale of which constitutes the infringement.*" 35 U.S.C. § 287(b)(1)(C) (2012) (emphasis added). This language makes clear that the act of infringement under § 271(g) occurs *after* a patented process has already been used. Thus, because practicing a patented process does not trigger liability under § 271(g), it is immaterial whether that process is practiced by more than a single entity. Additionally, § 287(b) limits available remedies under § 271(g) in certain circumstances where the manufacturer of a product made by a patented process "is not known." *See* 35 U.S.C. §§ 287(b)(3)(B)(iii); 287(b)(4)(A)(iii); 287(b)(5)(C)(i) (2012). It would not have made sense for Congress to make infringement liability under § 271(g) contingent on a single entity practicing a patented process while expressly providing limitations on that liability where it is unknown which manufacturer—or how many—practiced the process.

The legislative history is instructive. A Senate Report accompanying the Process Patents Amendments Act of 1987, the bill that enacted § 271(g), states that the purpose of the statute is to provide a remedy "when someone, without authorization, uses or sells in the United States, or imports into the United States a product made by their patented process." S. Rep. 100-83, at 29 (1987). The Report makes clear that § 271(g) was enacted to "extend protection to the *products*" resulting from practicing a patented process and to "prevent circumvention of a U.S. process patentee's rights through manufacture abroad and *subsequent importation into the United States of products* made by the patented process." *Id.* at 46, 48 (emphasis added); *see also id.* at 30 (stating that § 271(g) would "protect against the entry into the U.S. marketplace of goods made abroad without authorization from the inventor"). Even Willowood concedes that the legislative history's clear "focus is on the importation of products," rather than on the use of a patented process. Appellee's Br. 31 The Report also clarifies that § 271(g) "does not attempt to prevent *the use of the process in another country*." S. Rep. 100-83, at 30 (emphasis added); *see also id.* at 48. The Report explains that a "U.S. process patentholder [that] has not obtained a similar patent in the other country . . . has no right by virtue of his U.S. patent to prevent anyone from using the process in that country." S. Rep. 100-83, at 30. Thus, because simply practicing a patented process abroad does not come within the ambit of § 271(g), that there may be several entities involved in practicing the process is immaterial to the infringement analysis under § 271(g).

Willowood argues that in enacting § 271(g), Congress intended to provide patentees with "the same protection against overse[a]s infringers as they already enjoyed against domestic entities." Appellee's Br. 30 (quoting *Mycogen Plant Sci., Inc. v. Monsanto Co.*, 252 F.3d 1306, 1318 (Fed. Cir. 2001), *judgment vacated on other grounds*, 535 U.S. 1109 (2002)) (emphasis removed). On this basis,

Willowood contends that because direct infringement of a process patent under § 271(a) requires the same entity to perform all of the claimed steps, the same must be true under § 271(g). *Id.* at 30–31. We disagree.

The statutory language and legislative history described above make clear that practicing a patented process abroad does not trigger liability under § 271(g) in the same manner that practicing a patented process domestically does under § 271(a). Section 271(a) covers all patented processes, whether or not they result in a product. Infringement under § 271(g) instead requires importation, sale, offer for sale, or use within the United States of a product made by a patented process. The different scope of protection offered under § 271(a) and § 271(g) demonstrates that there is no inconsistency between the two sections. The legislative history further demonstrates that Congress did not enact § 271(g) to provide for identical rights to those enjoyed by patentees under § 271(a) with respect to process patents. Rather, Congress made clear that § 271(g) "is prompted by the use of patented processes in other countries *followed by the importation of the resulting products into this country*," and simply "extend[s] protection to the products" made by such processes. S. Rep. 100-83 at 46.

Lastly, applying a single-entity requirement to the practice of a patented process under § 271(g) would impose an undue evidentiary burden on patentees that is contrary to the intent of Congress. Congress recognized "the great difficulties a patentee may have in proving that the patented process was used in the manufacture of the product in question" where the manufacture occurred abroad. *Id.* at 57. As a solution, Congress provided for a rebuttable presumption in § 295 that shifted the burden to the accused infringer to prove that the patented process was not used in manufacturing the accused products. *See* 35 U.S.C. § 295. Congress would not have on the one hand recognized the difficulty in determining *how* a product was

manufactured, and on the other hand concluded that determining *who* manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process.

We hold that in light of the plain language of the statute, the broader context of the statutory scheme as a whole, and the legislative history, § 271(g) does not require a single entity to perform all of the steps of a patented process for infringement liability to arise from the importation into the United States or offer to sell, sale, or use within the United States of a product made by a process patented in the United States.

It is undisputed that Willowood USA imported into the United States an azoxystrobin compound that was manufactured abroad using the process patented by the '138 patent. *Summary Judgment Order*, 2017 WL 1133378, at *5. We therefore reverse the district court's judgment that Willowood USA did not infringe the '138 patent under § 271(g). The jury found, however, that Willowood China did not import into the United States or sell or offer for sale in the United States the azoxystrobin compound at issue, and as discussed below, substantial evidence supports this finding. We therefore affirm the district court's judgment that Willowood China did not infringe the '138 patent under § 271(g). Because neither the jury nor the district court made any findings concerning Willowood LLC's role, if any, with respect to the azoxystrobin compound made using the process claimed in the '138 patent, we vacate the district court's judgement that Willowood LLC did not infringe the '138 patent under § 271(g) and remand for further proceedings.

## IV. Infringement by Willowood China

Syngenta argues that the district court erred as a matter of law by denying its JMOL motion and entering judgment in favor of Willowood China on the issues of infringement of the Compound Patents and the '761

patent.[7] Syngenta contends that substantial evidence does not support the jury's verdict that Willowood China did not sell or import azoxystrobin within the United States. Syngenta points to evidence it presented that Willowood China "agreed to be 'the exclusive seller'" of Tai He's azoxystrobin within the United States and continued to sell azoxystrobin to Willowood USA after 2013. Appellant's Br. 63. Syngenta argues that the fact that Willowood China's sale of azoxystrobin to Willowood USA was made "f.o.b. China" is not determinative, because "a sale can take place in more than one location." Appellant's Reply Br. 36. Syngenta also contends that Willowood China imported azoxystrobin into the United States, pointing to evidence in the record that Willowood China coordinates the shipping from China to the United States, pays freight charges, and makes delivery arrangements. Appellant's Br. 63; Appellant's Reply Br. 34–35. We are not persuaded by Syngenta's arguments.

The question before us is not whether substantial evidence supports Syngenta's position but whether substantial evidence supports the jury's verdict. *See Regents of Univ. of California v. Broad Inst., Inc.*, 903 F.3d 1286, 1294 (Fed. Cir. 2018) ("We do not reweigh the evidence. It is not our role to ask whether substantial evidence supports fact-findings not made . . . , but instead whether such evidence

---

[7] On the issue of Willowood China's alleged infringement of the Compound Patents, Syngenta appeals both the district court's denial of its motion for summary judgment and its post-verdict motion for JMOL. *See* Appellant's Br. 58–68. A district court's denial of summary judgment is not appealable after a trial on the merits. *Ortiz v. Jordan*, 562 U.S. 180, 183–84 (2011); *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1322 (Fed. Cir. 2013). We therefore limit our review to Syngenta's appeal of the district court's denial of JMOL.

supports the findings that were in fact made."). Here, the jury heard evidence that because the shipment of azoxystrobin was marked "f.o.b. China," legal title passed from Willowood China to Willowood USA in Hong Kong. *See* J.A. 6794. The jury also heard evidence that Willowood USA is responsible for clearing the shipments of azoxystrobin through customs in United States and for registering the fungicide with the EPA. J.A. 6795. In addition, Willowood presented testimony that Willowood USA reimburses Willowood China for the freight charges, and the jury saw Willowood's invoices stating that Willowood USA assumes the entire liability for the shipment of azoxystrobin from China to the United States. *See id.*; J.A. 8225–27.[8] We conclude that this is substantial evidence that supports the jury's findings that Willowood China did not infringe the Compound Patents because it sold azoxystrobin in China and did not import azoxystrobin into the United States.

Syngenta also contends that even if Willowood China did not infringe the Compound Patents, the jury found that Willowood China infringed the '761 patent. Syngenta points to the jury's finding that "the Defendants" did not prove that Willowood's azoxystrobin was not manufactured using DABCO within the range claimed by the '761 patent and the jury's award of damages for infringement of the '761 patent by "the Defendants." Appellant's Br. 68 (citing J.A. 267). Syngenta asserts that "the Defendants" referred to all Willowood entities collectively, including Willowood

---

[8]   Willowood's counsel confirmed at Oral Argument that Willowood USA is the importer of record and assumes the risk of shipment. Oral Arg. at 22:29–22:31, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2018-1614.mp3 ("The importer of record is Willowood USA."); *id.* at 23:16–23:19 ("Willowood USA assumes liability.").

China, and contends that Willowood waived any argument to the contrary by failing to object to the wording of the jury verdict form. *Id.* at 68, 71–72; *see also* Appellant's Reply Br. 39–42. Syngenta argues that the question on the jury verdict form regarding Willowood China's importation or sale of azoxystrobin applied only to the issue of infringement of the Compound Patents, not the '761 patent, and the district court erred by linking the two issues. Appellant's Br. 69–72; Appellant's Reply Br. 39–42.

We disagree.[9] As we discussed above, substantial evidence supports the jury's finding that Willowood China did not import azoxystrobin into the United States or sell or offer for sale azoxystrobin within the United States. The district court was thus correct to find that Willowood China did not infringe the '761 patent. J.A. 6489. To the extent there was any ambiguity in the jury verdict form, we have held that district courts enjoy "broad discretion to interpret an ambiguous verdict form, because district courts witness and participate directly in the jury trial process." *Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1378 (Fed. Cir. 2010); *see also Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1377 (Fed. Cir. 2017).

In light of the foregoing, we conclude that the district court did not err by denying Syngenta's JMOL motion with respect to infringement of the Compound Patents and the '761 patent and entering judgment in favor of Willowood China on these issues.

---

[9] We reject Syngenta's waiver argument because we "have the discretion to consider issues not raised below 'as justice may require.'" *Ninestar Tech. Co. v. Int'l Trade Comm'n*, 667 F.3d 1373, 1382 (Fed. Cir. 2012) (quoting *Hormel v. Helvering*, 312 U.S. 552, 555–59 (1941)).

## V. Willowood's Cross-Appeal

Willowood conditionally cross-appeals the district court's denial of its motion to exclude the testimony of Syngenta's expert concerning damages for infringement of the Compound Patents. Cross-Appellant's Br. 56–66. Syngenta responds that Willowood's cross-appeal is procedurally improper because it does not seek to expand the scope of the judgment below. Appellant's Resp. Br. 49–51. We need not decide these issues because Willowood's cross-appeal is conditional on our reversal of the judgment concerning the Compound Patents, and we affirm the district court in that respect.

## CONCLUSION

We have considered the parties' remaining arguments and find them unpersuasive. We conclude that the district court did not provide an adequate analysis of the potential conflict between FIFRA and the Copyright Act for us to determine whether such a conflict truly exists. We also conclude that the district court erred by imposing a single-entity requirement on the performance of a patented process under § 271(g). We agree with the district court in all other respects. We therefore affirm-in-part, reverse-in-part, vacate-in-part, and remand for further proceedings consistent with this opinion.

**AFFIRMED-IN-PART, REVERSED-IN-PART, VACATED-IN-PART, AND REMANDED**

## COSTS

Each party shall bear its own costs.